1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                    NORTHERN DIVISION

4

5     UNITED STATES OF AMERICA

6          vs.              CASE NO.: 2:08-cr-65-MHT

7     JACK FURMAN DEAN, JR.,

8               Defendant.

9          * * * * * * * * * * * * * * *

10                  SENTENCING HEARING

11                     VOLUME II

12         * * * * * * * * * * * * * * *

13          BEFORE THE HONORABLE MYRON H. THOMPSON, UNITED STATES

14    DISTRICT JUDGE, at Montgomery, Alabama, on Friday, December 19,

15    2008, commencing at 1:08 p.m.

16                       APPEARANCES

17    FOR THE GOVERNMENT:      Mr. Nathan Stump
                               Assistant United States Attorney
18                             OFFICE OF THE UNITED STATES ATTORNEY
                               131 Clayton Street
19                             Montgomery, Alabama   36104

20    FOR THE DEFENDANT:       Ms. Christine Freeman
                               Mr. Kevin Butler
21                             FEDERAL DEFENDERS
                               MIDDLE DISTRICT OF ALABAMA
22                             201 Monroe Street, Suite 407
                               Montgomery, Alabama   36104

23

24          Proceedings reported stenographically;

25          transcript produced by computer

```
 1                        EXAMINATION INDEX

 2                   CORPORAL REGINA DUCKETT

 3       DIRECT BY MR. STUMP                         9
         CROSS BY MS. FREEMAN                       14
 4
                        JACK F. DEAN III
 5
         DIRECT BY MS. FREEMAN                      25
 6       CROSS BY MR. STUMP                         28

 7                         RON ADAMS

 8       DIRECT BY MS. FREEMAN                      28
         CROSS BY MR. STUMP                         31
 9
                        NANCY CUTTS
10
         DIRECT BY MS. FREEMAN                      32
11
                        LINDA ADAMS
12
         DIRECT BY MS. FREEMAN                      36
13
                       DAVID GHOSTLEY
14
         DIRECT BY MS. FREEMAN                      42
15       CROSS BY MR. STUMP                         52
         DIRECT BY MR. STUMP                        56
16       CROSS BY MS. FREEMAN                       57

17                 CORPORAL REGINA DUCKETT

18       DIRECT BY MR. STUMP                        56
         CROSS BY MS. FREEMAN                       57
19                  * * * * * * * * * * * *

20       (The following proceedings were heard before the Honorable

21   Myron H. Thompson, United States District Judge, at Montgomery,

22   Alabama, on Friday, December 19, 2008, commencing at 1:08 p.m.)

23            THE COURT:  Is there any more evidence anyone would

24   like to put on with regard to the objections other than 69 at

25   this time, paragraph 69?
```

1          MR. STUMP:  Your Honor, no, not at this time.

2          MS. FREEMAN:  Your Honor --

3          THE COURT:  Anything else with regard to -- I believe

4     it's paragraph 26 we were addressing, too.

5          MS. FREEMAN:  Your Honor, I believe that the government

6     would proffer, and we would accept their stipulation, that the

7     Beta tapes were produced in 1992.

8          MR. STUMP:  That's correct.

9          THE COURT:  Okay.

10         MS. FREEMAN:  And Your Honor, I believe also, based on

11    part of the compilation that we just saw, I would renew my

12    objection to paragraph 26, which talks about the use of a -- use

13    of a person less than 18 to commit the offense.  Just before we

14    broke, we -- Corporal Duckett said that there was no proof that

15    this long extended video that was taken by another minor was at

16    the direction of Mr. Dean.

17         THE COURT:  Okay.  Anything else?

18         MS. FREEMAN:  As to those objections, that's it, Your

19    Honor.

20         THE COURT:  As to whether the other minor in the video

21    was taking the video at the direction of the defendant, the

22    Court has reviewed the video, and I find that it was clear that

23    she was doing it at his direction.  The way she did it, viewing

24    it in connection with the other videos, there's no way that a

25    girl of her age would have known how to do that video.  It's

1    clear that she had learned it from her dad.  It is also clear

2    that he was present, and it was also clear that she was doing

3    it.  And I would think that anyone who has to do this should

4    view the video.  It's evident from the video that she was doing

5    it at his direction.

6           MS. FREEMAN:  Your Honor, I understand that the Court

7    is making that finding and a ruling against me.  I strongly

8    disagree that there's any evidence of his instruction.

9           THE COURT:  I strongly believe what I saw.  I think

10   anyone who reviews that again, if you look at that video, you

11   can't reach any other conclusion.

12          Anything else?

13          There's no way a 13-year-old would make that video

14   without an adult.

15          MS. FREEMAN:  Your Honor, I don't believe the proof was

16   that there was a 13-year-old involved.

17          THE COURT:  Well, there's no question that her sister

18   was doing the video.

19          MS. FREEMAN:  Yes.

20          THE COURT:  And her sister was of a comparable age to

21   the victim.

22          MS. FREEMAN:  Yes.

23          THE COURT:  And there's no way that a girl at that age

24   could have made that video without an adult's direction.  It's

25   just implausible.  Just common sense tells you that.

1              Yes?

2              MR. STUMP:  I'm sorry, Your Honor.  Just a housekeeping

3     before I forget.  I would like to have -- we've already admitted

4     Exhibit 1.  I would like to orally move that it be placed under

5     seal.

6              THE COURT:  It's placed under seal.

7              MS. FREEMAN:  No objection to it being placed under

8     seal.  I renew my objection to it being admitted into evidence.

9              THE COURT:  The video is admitted for a number of

10    reasons.  Number one is the words in the presentence report

11    cannot begin to capture what's on the video.  There's only one

12    way to understand what's on that video, and that's to see it.

13    Words just don't begin to capture it.  I make that as a finding

14    of fact.

15             Secondly, the video is relevant to a number of

16    objections, including paragraph 69.  It's also relevant to

17    paragraph 27, which I've ruled on.  And now I think we have

18    paragraph 26.  It's less relevant to paragraph 26, but it does

19    have some relevance as well.

20             Finally, I think the video is relevant to, as I said

21    before, the defendant's contention that he loved the victim.  I

22    also think the video is relevant for all of these reasons with

23    regard to 3553 factors.

24             So let's address paragraph 26, the vulnerable victim

25    paragraph.  Let me hear your arguments on that.

1          MS. FREEMAN:  Your Honor, I made the argument just

2    before we broke that there is already an enhancement based on

3    the victim's age.  There is a separate enhancement based on the

4    custodial relationship between the victim and Mr. Dean.  There

5    is also a separate enhancement based on sadomasochism.  All of

6    those are in the presentence report.

7          THE COURT:  Wait a minute.  The sadomasochism I don't

8    think went to paragraph 26, did it?

9          MS. FREEMAN:  That's 24, Your Honor.  The age

10   enhancement is at paragraph 22.

11         THE COURT:  Right.

12         MS. FREEMAN:  The custodial relationship is at

13   paragraph 25.

14         THE COURT:  Right.  I did not remember your raising the

15   sadomasochism with regard to paragraph 26.  I thought that was

16   raised with regard to paragraph 69.

17         MS. FREEMAN:  Both, Your Honor.  The fact is that all

18   of the arguments --

19         THE COURT:  Wait.  What's the sadomasochism?  What

20   guideline is that so I can --

21         MS. FREEMAN:  Your Honor, that is 2G2.1(b)(4).  And

22   it's at paragraph 24.

23         THE COURT:  2G2 -- what -- 1(b)(4)?  No, that's not

24   right, is it?

25         MS. FREEMAN:  2G2.1(b)(4).

 1          THE COURT:  Oh, 2G2.  Okay.  So you're raising this

 2    also with regard to paragraph 26?

 3          MS. FREEMAN:  Yes, Your Honor, because the description

 4    of what the probation officer and government contend makes the

 5    vulnerable victim enhancement separately applicable relates to

 6    all of these other facts about the conduct in this case.

 7          THE COURT:  How does -- how does 2G2.1(b)(4) go to

 8    vulnerable victim?  I still don't understand that.

 9          MS. FREEMAN:  Well, to the extent that there is --

10    there is an allegation of threats and an allegation of

11    brainwashing.  Basically, I think that paragraph 26 in the

12    presentence report is saying that all of this conduct may -- or

13    that it itself caused an extra vulnerability.  I believe that's

14    double counting.

15          I also would point out that there are some conclusions

16    included in paragraph 26, notably the third sentence related to

17    use of the term, in quotes, groomed.  That, obviously, is the

18    probation officer's conclusion.  There's nothing anywhere on the

19    record, there's no expert testimony, there's no discovery,

20    there's no PSI factual assertion that supports that.

21          THE COURT:  Okay.

22          MS. FREEMAN:  Your Honor, in addition, we simply

23    dispute that these threats were made.

24          THE COURT:  What threats?

25          MS. FREEMAN:  The threats described in paragraph 26.

 1          THE COURT:  Okay.

 2          MS. FREEMAN:  I believe Corporal Duckett addressed them

 3   to some extent during her testimony.

 4          THE COURT:  Now, if we're going to go into whether the

 5   threats -- alleged threats in paragraph 26 were made, are you

 6   contending that he did not say that he threatened to kill her or

 7   leave her mother if she told of these incidents?  Are you taking

 8   that -- are you contending that did not occur?

 9          MS. FREEMAN:  Yes, Your Honor.

10          THE COURT:  And also are you contending that he did not

11   say that he would leave them with nothing if she told and that

12   they would be poor if she told?

13          MS. FREEMAN:  Yes.

14          THE COURT:  And also that he emphasized that he was her

15   only father and reminded her that her mother had already gone

16   through one failed marriage, suggesting that they would be

17   devastated upon another failed marriage?  Do you contend that

18   that did not occur as well?

19          MS. FREEMAN:  Yes, Your Honor.

20          THE COURT:  What evidence do I have to support these

21   alleged threats?

22          MR. STUMP:  Your Honor, we are prepared only to provide

23   additional testimony from Corporal Duckett on that matter.

24          THE COURT:  Okay.  Go ahead.

25          MR. STUMP:  Okay.  United States recalls Corporal

1    Duckett.

2        CORPORAL REGINA DUCKETT, the witness, having been duly

3    sworn, testified as follows:

4                          DIRECT EXAMINATION

5    BY MR. STUMP:

6    Q.  Ma'am, I'll remind you, you're still under oath.

7    A.  Yes.

8    Q.  You were in court just now and heard the exchange back and

9    forth between the judge and defense counsel about some threats

10   and that kind of thing, right?

11   A.  That's correct.

12   Q.  Can you tell us what you learned as -- in the course of your

13   investigation about any threats that were made by this defendant

14   to the victim in the case?

15   A.  Yes.  According to the victim, in one of her statements she

16   did tell me that on multiple occasions the defendant did, in

17   fact, threaten to leave her mother and would leave them

18   penniless and homeless if she, in fact, did tell on him.

19           THE COURT:  Now, I need to get context, so you need to

20   tell me when, what year, and approximately how old the victim

21   was at this time.

22           THE WITNESS:  During her -- I believe it was the very

23   beginning, Your Honor.  It was in her second statement that she

24   gave to me, and I don't know -- I don't remember or recall that

25   she remembered the exact year herself.  It was just during the

1    course of this entire thing.

2          The threat level changed the older she got.  Initially

3    it began with nobody would believe her because of a situation

4    that occurred with her stepsister --

5          THE COURT:  Well, it's more helpful if either you or

6    someone else can tell me approximately how old she was when

7    these so called threats were made.

8          THE WITNESS:  It was during the entire course of --

9          THE COURT:  Okay.

10         THE WITNESS:  -- these years, Your Honor.

11         THE COURT:  Well, go ahead, and then we'll come back to

12   that.

13   A.  Okay.  I'm sorry.  I know there was a situation involving a

14   stepsister where I believe that she was allegedly abused as a

15   child as well, and the defendant also used that against the

16   victim, Bonnie, saying that nobody believed what happened to

17   Amy, so why would anybody believe what was happening with her.

18   And then from there it escalated.  He would buy her clothes and

19   things to make her feel pretty.  She was only allowed to wear

20   those during the acts that were taking place in the videos, and

21   then he would take those clothes from her and not give them back

22   unless she performed further acts.

23         MS. FREEMAN:  I'd object.  This isn't even responsive

24   to the question.

25         THE COURT:  Well, I'll allow it in to --

1          MS. FREEMAN:  In addition, Your Honor, this is hearsay,

2    obviously, and it's not been established that it's reliable

3    hearsay.

4          MR. STUMP:  Your Honor, the only person that could

5    testify to this other than Corporal Duckett or better than

6    Corporal Duckett, aside from the defendant himself, is the

7    victim in his case, and I am loathe to put her on the stand for

8    this particular objection.

9          THE COURT:  Well, I really would like to know the age

10   at which this occurred.  Would you like to talk to her to see if

11   she would be willing to do it?

12         MR. STUMP:  Your Honor, I can just tell the Court right

13   now, she's unwilling to do it.

14         THE COURT:  She is?

15         PROBATION OFFICER:  Your Honor, I would also like to

16   add that if we're talking about just this one objection, it

17   would not change the guideline range at the end of the day.  It

18   would still be life.

19         THE COURT:  Oh, really?

20         PROBATION OFFICER:  Yes, sir.

21         THE COURT:  Okay.  So you're saying this guideline

22   would not change anything?

23         PROBATION OFFICER:  I believe it would result in a

24   two-level reduction to a 43.  Forty-five minus two is 43.  It

25   still would be a life term.

 1          THE COURT:  My main concern is that I just can't tell

 2   when.  If it happened during her early years, I think the

 3   objection would apply -- I mean, I think the guideline would

 4   apply, primarily because I think the additional vulnerability

 5   came that he realized that she was dependent on her mother; that

 6   he was a stepfather in there.  That's different from these other

 7   guidelines.  But without the time factor, I'm a little reluctant

 8   to do that.

 9          MR. STUMP:  Yes, sir.

10   BY MR. STUMP:

11   Q.  Corporal Duckett, do you have anything in your case file

12   that would assist you in answering that question?

13   A.  I can review the interview conducted with the victim, yes.

14   Q.  If you reviewed it, do you think that there is a possibility

15   that you would find some evidence to suggest the time frame in

16   this particular --

17          THE COURT:  I'm also concerned about the hearsay.  This

18   is just so critical.

19          MR. STUMP:  Yes, sir.  Well, Your Honor, given the fact

20   that it wouldn't change the guideline, at this point, short of

21   prolonging this, and certainly short of calling the victim

22   herself, I would just concede the enhancement.

23          THE COURT:  Okay.  Then we'll -- I'll sustain the

24   objection to 27 because the government has conceded it, and I

25   think rightly so.

```
 1          That leaves us with objection -- I've already ruled on
 2   27.  Twenty-six is withdrawn for -- resolved.  So now we're up
 3   to, what, 69?
 4          MS. FREEMAN:  Yes, sir.
 5          THE COURT:  Okay.  What evidence do I have as to 69?
 6          MR. STUMP:  Your Honor, we would cite the CD or the DVD
 7   that's already been viewed by the Court.  We skipped over some
 8   things, I don't think it's necessary for the Court to review
 9   them, but I believe that the descriptions that we're relying on
10   are in the presentence report.  I also have a few additional
11   questions for this witness.
12          THE COURT:  Go ahead.
13   BY MR. STUMP:
14   Q.  Corporal Duckett, do you know anything -- in the course of
15   your investigation, did you learn whether the victim had any
16   medical complications as a result of this offense conduct?
17   A.  That's correct.  According to her, she's had to have three
18   rectal surgeries as a result.
19   Q.  I'm sorry.  And could you slow down, please, for the court
20   reporter.
21   A.  She's had three rectal surgeries as a result of some of the
22   offenses committed by the defendant.
23   Q.  You were in court when we watched the video compilation
24   that's Exhibit 1, right?
25   A.  Correct.
```

1  Q.  Did that -- did what we see in court encompass all of the

2  conduct that can be considered cruel or brutal or inflicting

3  pain?

4  A.  It touched on the majority of it, yes.  There are numerous

5  videos involving the acts that we saw on that DVD.  There are

6  several more involving the bondage, the role playing, the -- all

7  the acts that were performed, a lot of them came from

8  pornography videos that he had in his possession during the

9  search warrant.  We have those videos.  You can almost watch the

10 pornography video and watch what he did with the victim, and

11 they're almost identical.  They even did role playing in

12 reference to it, and it escalated as the years went on.

13 Q.  Can you tell us approximately how many videos you recovered

14 that were of evidence in this case?

15 A.  We viewed 1330.  I believe 275 were deemed as evidential,

16 and I believe somewhere around the number of 58 were juvenile

17 related.

18         MR. STUMP:  Your Honor, if I could have a moment.

19         Your Honor, no further questions.

20         THE COURT:  Cross?

21         MS. FREEMAN:  Yes, Your Honor.

22                    CROSS-EXAMINATION

23 BY MS. FREEMAN:

24 Q.  Corporal Duckett, did you obtain any medical records

25 relating to the victim?

```
 1   A.   No, I did not.
 2   Q.   Did you obtain -- did you interview any doctor or medical
 3   personnel who had treated her?
 4   A.   No, I did not, but there's some video evidence that shows
 5   the scarring.
 6   Q.   You did not obtain any medical evidence of the existence of
 7   any surgery?
 8   A.   No, I did not.
 9   Q.   So you do not have confirmation of that assertion from any
10   source?
11   A.   Just from the victim.
12        MS. FREEMAN:  Your Honor, I would object to that
13   testimony and move that it be stricken.
14        THE COURT:  What's your response?
15        MR. STUMP:  Your Honor, it's clearly hearsay, but this
16   is a proceeding in which hearsay is allowed.  I believe in this
17   case the information came directly from the victim herself.
18   Everything else that has come from this victim about this case
19   has been --
20        THE COURT:  To be quite candid with you, I watched the
21   video, and I really don't need the medical evidence.  I can see
22   that she was physically tortured.  And I mean tortured.  So I
23   consider the medical evidence, at best, redundant.
24        MR. STUMP:  That's fine, then, Your Honor.
25        MS. FREEMAN:  Your Honor, my other objection to the
```

1   enhancement or proposed enhancement is that there is no question

2   that there was no intercourse until --

3          THE COURT:  No what?

4          MS. FREEMAN:  There was no penetration until after the

5   age of 18.  And much of what we have seen, first of all --

6          THE COURT:  We're talking about which guideline, now?

7          MS. FREEMAN:  Paragraph -- guideline 5K2.8.

8          THE COURT:  Oh, okay.  This is the heinous?

9          MS. FREEMAN:  Paragraph 69.  Yes, sir.

10          THE COURT:  That there was no penetration until 18?

11          MS. FREEMAN:  Yes, sir.  That's what is described in

12   the presentence report.  In addition, this video contained --

13   much of the more extreme conduct described in it, and I'm not

14   suggesting that any of it is less than extreme, is of conduct

15   that occurred after the age of 18.

16          THE COURT:  Yes?

17          MR. STUMP:  I want to make two points.  One is that the

18   medical evidence that was just elicited is in the presentence

19   report at paragraph eight.  There's been no objection --

20          THE COURT:  Just a minute.  Let me get the presentence

21   report.  So what is your question, now?  I mean, what are you

22   stating?  I don't understand.

23          MR. STUMP:  Your Honor, I just wanted to respond on

24   this objection that this medical evidence that we just addressed

25   is at paragraph eight of the presentence report.  There was no

1   objection from the defendant to its inclusion in this report.

2   I'm looking towards the bottom of page four of my copy.

3           THE COURT:  So you're saying it's in the report anyway,

4   you don't need it from this witness?

5           MR. STUMP:  That's correct, Your Honor.

6           And I'd also address what Ms. Freeman just said about

7   penetration.  I'm looking for it in here.  I know that the fact

8   of the matter is that there was digital and anal penetration

9   prior to her 18th birthday.  And I believe the witness can

10  testify to that, but I do believe it's also contained somewhere

11  in this presentence report.

12          THE COURT:  That what?

13          MR. STUMP:  I believe that the fact that there was

14  penetration prior to 18, although it may not have been vaginal

15  intercourse, that there was other penetration prior to the age

16  of 18.  I believe that's in this particular presentence report.

17  In fact, I think it comes from a statement of the defendant.

18          THE COURT:  I'm trying to understand what you're

19  saying.  You're saying prior to age 18, there was no digital or

20  anal intercourse?

21          MS. FREEMAN:  No, Your Honor.

22          MR. STUMP:  Yes, Your Honor.  There was.

23          THE COURT:  There was?

24          MR. STUMP:  I'm just trying to clarify that.

25          MS. FREEMAN:  I'm not saying that.

1          MR. STUMP:  Ms. Freeman said there was no penetration.

2     I believe that's incorrect.

3          MS. FREEMAN:  And I'm not sure that I said that.

4     Paragraph eight is what Mr. Stump is referring to.  The first

5     sentence refers to digital penetration at the age of 14.  My

6     point is, Your Honor, for the enhancement proposed in paragraph

7     69, that has to involve something other than the conduct that

8     constitutes the offense.  And there is nothing about the simple

9     conduct that constitutes the offense, which is a criminal

10    offense, which is damaging, but that equals the extreme conduct

11    described in 5K2.8 and recommended for enhancement in paragraph

12    69.  The most extreme conduct which the government has presented

13    through the video all occurs after the victim is well past the

14    age of 18.

15         THE COURT:  Okay.  Let's talk about that for a second.

16    What about when he's whipping her?  Was that before or after

17    18?

18         MR. STUMP:  If I could address the question to the

19    witness.

20         THE WITNESS:  Several of those were before, Your Honor.

21         THE COURT:  Pardon me?

22         THE WITNESS:  Several of the videos contained slaps,

23    and they were before her 18th birthday.

24         THE COURT:  The one with the extensive whipping where

25    she's screaming and --

1        THE WITNESS:  In reference to the video?

2        THE COURT:  Yes.

3        THE WITNESS:  I believe that was prior to her 18th

4   birthday.

5   BY MR. STUMP:

6   Q.  Corporal Duckett --

7        THE COURT:  But obviously, the rape that occurs later

8   when she's 27, obviously, that's after she was 18.

9        THE WITNESS:  Correct.

10  BY MR. STUMP:

11  Q.  Corporal Duckett, the portions of the video that we saw that

12  involved whipping as the Court described it, was that the

13  only -- the ones that we saw, are those the only ones that were

14  on any video that you seized?

15       THE WITNESS:  No.  There are several, several of that

16  activity.

17       THE COURT:  Let me ask you this, Mr. Stump.  In

18  applying guideline 5K2.8, do I only apply the conduct before 18,

19  or do I consider conduct after 18?

20       MR. STUMP:  Your Honor, I believe this --

21       THE COURT:  That is, conduct towards the victim.

22       MR. STUMP:  Your Honor, I believe this can apply to all

23  conduct in the case, all relevant conduct.  I don't know that

24  there's anything in the specific guideline, 5K2.8, that says

25  that.  I believe this would be in the relevant conduct portion

1    of the guidelines.

2         THE COURT:  Let me ask probation this.  How much did

3    you increase the guideline range as a result of 5K2.8?

4         PROBATION OFFICER:  The truth of the matter, Judge, is

5    I did not increase the guideline range because of that.  What we

6    do is we point out to the Court circumstances and situations

7    which the Court can consider in his deliberations in imposing

8    sentence.  And at the very beginning of that presentation, it

9    states that this does not necessarily constitute a

10   recommendation by the probation officer.  I did not make a

11   recommendation for the enhancement.

12        THE COURT:  Why am I considering this if probation

13   didn't even recommend an increase based on 5K2.8?

14        MR. STUMP:  Your Honor, I don't think it's necessary

15   for the Court to consider it.  We have a guidelines range of

16   life.  The statutory maximum is 30 years.  The probation office

17   is recommending 30 years.  I'm simply anticipating that the

18   defense is going to ask this Court for something less than the

19   guideline range, and I believe that this is relevant to the

20   Court's determination on that.

21        THE COURT:  That would be more of a *Booker* issue,

22   wouldn't it?  Something less than the guideline range?

23        MR. STUMP:  That's -- I believe that's going to be a

24   *Booker* issue, yes, Your Honor.

25        THE COURT:  Right.  So I don't -- to me, this issue is

 1   moot as far as calculating the guidelines.  If I rule either

 2   way, the guidelines are going to remain the same.

 3            MR. STUMP:  Yes.  I believe that's correct, Your Honor.

 4            THE COURT:  Then I'll sustain the defendant's

 5   objection.  Anything else?

 6            MS. FREEMAN:  No, Your Honor.

 7            THE COURT:  So what's the guideline range?  I've ruled

 8   on all the guidelines issues, haven't I?

 9            PROBATION OFFICER:  Your guideline range is 30 years.

10            THE COURT:  Okay.  And what is the -- no.  I'm sorry.

11   What is the --

12            PROBATION OFFICER:  The total offense level is 43.

13            THE COURT:  Total offense level is 43.

14            PROBATION OFFICER:  And your criminal history category

15   is I.

16            THE COURT:  And that gives us a guideline of what?

17            PROBATION OFFICER:  Thirty years.

18            THE COURT:  Thirty?

19            PROBATION OFFICER:  Yes, sir.  It absolutely would be

20   life, but the statutory maximum is 30 years.  Twenty --

21            THE COURT:  The guideline is 30 years here?

22            PROBATION OFFICER:  Yes, sir.  Twenty years and ten

23   years consecutive.

24            THE COURT:  Twenty and 10.

25            The Court finds that the total offense level is 43, the

1    criminal history category is I, giving us an actual guideline of

2    30 years because the guideline range is life.  And the question

3    now is do I vary from the guideline.

4           MS. FREEMAN:  Your Honor, I just would -- the witness

5    is still on the stand.  Is she --

6           THE COURT:  Okay.  Any more questions for her?

7           MS. FREEMAN:  No.

8           THE COURT:  You may step down.

9           So now the question is, do I vary from the guidelines

10   one way or the other.  And you have evidence on that?  Do you

11   have any more evidence to present on this issue?

12          MR. STUMP:  Yes, Your Honor.  I would like -- I have a

13   statement from the victim in this case that I would like to read

14   for the Court.

15          THE COURT:  Go ahead.

16          MR. STUMP:  This is dated December 19th, 2008.

17          I would like to start out by saying that I would rather

18   be reading this myself.  However, it is not in my best interests

19   since I am now ten weeks pregnant.  With that said, I just want

20   to say that over the past year, it has been very difficult for

21   me.  I have had so much to deal with both emotionally and

22   physically.  I lost a family I had for 19 years, and I'm

23   watching my mother go through very tough times.  I was so scared

24   to tell and report my stepdad, Jack, because I prayed every day

25   the abuse would stop.  My mom married this man and he started

1    raising me at the age of eight.  I tried to pretend that the

2    abuse and threats would all go away and that I could one day

3    have a normal life.  I finally realized that my life was in

4    danger and that I had to tell someone and seek help.  I now know

5    that this was the right thing to do.  My past has been relived

6    many times over the past 15 months since this has all come out

7    in the open.  I have had to watch things that were videoed that

8    I don't remember ever happening.  Apparently, the videotaping

9    started while I was sleeping at the age of 10.  I was not aware

10   that he started doing things to me at such a young age.  That

11   being said, I thought that one trial would be hard enough to

12   face, but now I am facing two.  Jack also had a friend that was

13   involved that started abusing me at the age of 13.  This was all

14   recorded on video, and now I have this trial to face as well.  I

15   tried to forget about that happening to me because Jack told me

16   that he destroyed all the evidence, and he stated that I would

17   never have to do this again.  The detectives found several

18   videos, and now that is being relived as well.  I have had

19   nightmares and dreams and still have to think of all the stuff

20   that has happened to me.  As far as my personal health is

21   involved, I had to have three rectal surgeries within the year

22   of 2003.  My bladder has been stretched twice, and I also have

23   chronic endometriosis and interstitial cystitis.  I was in

24   denial that this was all triggered by my history of abuse.  I

25   was recently told by my doctor that my history explains why I

1    have had so many health problems.  My husband and I had to try

2    for almost two years to finally have a baby.  I have restless

3    nights due to bladder spasms.  In the past six months, I had to

4    have bladder treatments and tests to find out if I would be able

5    to have a baby.  This baby is our miracle child that we thought

6    could never be possible.  This isn't just about what happened to

7    me, because my husband had to deal with the shock of losing his

8    father-in-law, barber, and someone he trusted.  I never wanted

9    anyone to go through so much hurt.  But the fact remains that

10   Jack made a decision, and he never denied what he did.  I was

11   brainwashed and had to act out his fantasies that were forced

12   upon me with behind-the-scene threats.  I know that I can't make

13   this go away.  But in making your decision, know that this is

14   not only about the crime he committed against the law, but the

15   hurt that his entire family is dealing with.  I do not consider

16   myself as a victim.  I claim to be an overcomer.  I have fought

17   all of my life to get through this.  Today is my day for

18   closure, and I hope that everyone here will understand that I am

19   a human being just as you are.  I would never want to be the

20   blame for his kids losing their father, but know if I had told

21   years ago they wouldn't be able to have him in their lives as

22   long as they did.  To you, Jack, I only wanted to have a father

23   in my life because my own father could not do all he needed to

24   do due to his own issues.  You were a great dad to all your

25   other kids, and I never did understand why you couldn't just be

1  a dad to me as well.  I hoped that you would change, but it only

2  got worse.  I lost my biological daddy last November, so now he

3  can't be there to walk me through this difficult time in my

4  life.  As I close this, I just have to say that today I know

5  justice is being done no matter what happens.  I am still alive,

6  and I am a wonderful testimony of how the Lord has carried me

7  through this.  If I hadn't been through everything that I've

8  been through, I wouldn't be the person I am today.  Sincerely,

9  Bonnie Lindsey.

10          THE COURT:  Is that it?

11          MR. STUMP:  That's it, Your Honor.

12          THE COURT:  I'll hear from the defendant.

13          MS. FREEMAN:  Yes, Your Honor.

14          THE COURT:  You have witnesses?

15          MS. FREEMAN:  Yes, I do, Your Honor.

16          THE COURT:  Let me hear them.

17          MS. FREEMAN:  Yes.   Jack Dean.

18       JACK F. DEAN III, the witness, having been duly sworn,

19  testified as follows:

20                      DIRECT EXAMINATION

21  BY MS. FREEMAN:

22  Q.  Mr. Dean, could you please state your full name and your

23  relationship to the defendant, Jack Dean.

24  A.  Jack Furman Dean III.  I'm his son.

25  Q.  And can you tell us how old you are.

1   A.   Twenty-nine.

2   Q.   And where are you living now?

3   A.   I just recently moved to Mississippi.

4   Q.   How are you employed?

5   A.   The U.S. Air Force.

6   Q.   What do you do with the U.S. Air Force?

7   A.   I'm an instructor for computer networking.

8   Q.   Are you married?

9   A.   Yes.

10  Q.   And do you have any children?

11  A.   Two.

12  Q.   Can you tell us and tell the Court what your relationship

13  with your father, the defendant, has been.

14  A.   He was an outstanding father.  He was the person that I

15  always looked up to.  He's always been there for me, and I

16  continue to hold him in high regard.

17  Q.   Can you tell the Court, what are some of the things that he

18  did that make you believe that he was an outstanding father?

19  A.   He raised five kids while holding three jobs.  He was

20  constantly working all the time, but yet he still had the

21  energy and -- to take us all out and, you know, do things with

22  us and always have a good time and most of the time it was by

23  himself.  He would take -- you know, bundle us all up in a van

24  or station wagon, and we would go skating or bowling or

25  whatever.  In my current -- the past couple of years, I've been

1    stationed away from him, and he's borrowed whatever vehicle he

2    possibly could, even though it possibly couldn't even make it,

3    to us and -- just to come and see us and spend time with my

4    kids.

5    Q.  When you refer to the five children your father raised, can

6    you tell us who they were.

7    A.  Well, I'm the oldest of five.  My sister, Amy; my

8    stepsister, Bonnie; my stepbrother, B.J., and my half-sister,

9    Lauren.

10   Q.  And during the time that you were growing up, did you confer

11   with your father about life decisions that you were making?

12   A.  Yeah.

13   Q.  Did you talk to him about going into the military?

14   A.  Yes.  It was a decision I took to both my -- both of my

15   parents.  They helped me -- they let me lead my own path, but

16   they also helped guide me.  Initially in the military, when I

17   first got in, I was really scared.  He and my mother were both

18   the people I would call for comfort, and that's why -- how and

19   where I am today, ten years later.

20   Q.  So you've been in the Air Force for ten years now.

21   A.  December 2nd was ten years.

22   Q.  And what is your rank?

23   A.  E5, staff sergeant.

24   Q.  And you are still in -- well, how would you describe your

25   present relationship with your mother and your father?

1   A.   I still love them both dearly.

2          MS. FREEMAN:   No further questions, Your Honor.

3          THE COURT:   Cross?

4                          CROSS-EXAMINATION

5   BY MR. STUMP:

6   Q.   Good afternoon, Mr. Dean.

7   A.   How's it going.

8   Q.   Pretty good.

9        You love your father no matter what, right?

10  A.   Yes.

11         MR. STUMP:   No further questions.

12         MS. FREEMAN:   I'll call Ron Adams.   You can step down,

13  Mr. Dean.

14       RON ADAMS, the witness, having been duly sworn, testified

15  as follows:

16                         DIRECT EXAMINATION

17  BY MS. FREEMAN:

18  Q.   Mr. Adams, what is your relationship to the defendant, Jack

19  Dean?

20  A.   He's my brother-in-law.

21  Q.   And are you married to his sister?

22  A.   Yes, ma'am.

23  Q.   What is his sister's name, your wife?

24  A.   Linda Gail Dean Adams.

25  Q.   How long have you known Jack Dean?

```
 1   A.   Little over 30 years.

 2   Q.   And during that time, have you lived in the same community

 3   as Jack Dean?

 4   A.   Not in the past 12 to 13 years.

 5   Q.   But for the first approximately 15 to 20 years, you did?

 6   A.   Yes.

 7   Q.   How often was your contact with Mr. Dean during those

 8   earlier years?

 9   A.   We used to play golf and games and everything.  That's about

10   all I remember.

11   Q.   So would you see him every week, every day?  How often?

12   A.   Saw him quite a bit.  He used to -- he cuts my hair, and we

13   had a lot of fun together.

14   Q.   Can you describe what you know of Mr. Dean's life during

15   that time.

16   A.   He was a loving person.  Took care of his children.  He

17   worked hard.  I used to work two jobs for quite a while.  He's

18   worked three for a long time.  I didn't understand how he could

19   do that so long and have so much energy, plus take his children,

20   you know, and do different things with them.  I always had to

21   work too much, you know, to do it for mine, but he always seemed

22   to have time.

23   Q.   What was -- in terms of your relationship with him,

24   obviously, you're his brother-in-law, and you engaged in social

25   activities with him.  Did you have any deeper friendship?
```

1    A.   I would do anything for him as long as it was right and

2    according to law, you know.   I love him very much.

3    Q.   During the last 12 or so years, have you lived in another

4    community from Mr. Dean?

5    A.   Yes.

6    Q.   And where have you been living?

7    A.   Andalusia.

8    Q.   How often do you see -- have you seen him since you began

9    living in Andalusia?

10   A.   Didn't get to see him very much because I worked a lot and

11   lived out of town, but occasionally we would play some golf.

12   Q.   Would you --

13   A.   I'd get a hair cut occasionally.

14   Q.   Would you see him several times a year?

15   A.   That's hard to pin down.   Could be close.

16   Q.   Okay.   And can you describe to the Court what you believe

17   Mr. Dean has provided to you as a friend and brother-in-law.

18   A.   Seeing him work so hard and do what he's done, I have -- I

19   had three girls, and it seemed like he could do more for his

20   than I could for mine.   And I was sensitive to that because my

21   parents didn't have a lot of time with me when I was a child, so

22   I could see what he was doing and wished I could do the same.

23   But he's always worked hard, so I work hard and hardly ever miss

24   any time.   But I've always looked up to him and respected him.

25   He's been -- he's just meant a lot to me.

1    Q.   Would you say that you love him very much?

2    A.   Yes.

3         MS. FREEMAN:   No other questions, Your Honor.

4                        CROSS-EXAMINATION

5    BY MR. STUMP:

6    Q.   Mr. Adams, good afternoon.

7    A.   Yes.

8    Q.   You said you've lived in Andalusia for the past 12 or 13

9    years?

10   A.   I live in Andalusia now.  I lived in Rose Hill, about 12

11   miles out in the country.  But we just moved to Andalusia about

12   two or three months ago, you know, about -- it's about the same

13   neighborhood.

14   Q.   And during those 12 or 13 years, you had just sort of

15   occasional contact with Mr. Dean?

16   A.   Right.

17   Q.   Now, you said that you kind of looked up to him in a way for

18   the way he was with his girls?

19   A.   Jake and B.J. and all, he took them to movies and stuff.  He

20   spent time with them.  I didn't do like he did as far as

21   spending time -- taking them to do things is what I'm speaking

22   of.

23   Q.   You know something about why we're here today, right?

24   A.   Yeah.  Yeah, from him being in jail, yeah.

25   Q.   Yeah.  I mean, even though you weren't there the last 12 or

1    13 years, you've now found out that he was sexually abusing his

2    stepdaughter, right?

3    A.   I found out about the allegations, I think, last September,

4    if I'm correct, when he got arrested.

5    Q.   Well, you know they're not allegations anymore.  You know

6    he's been convicted.

7           THE COURT:  What's the purpose of this?

8           MR. STUMP:  No further questions.

9           MS. FREEMAN:  I have no other questions for Mr. Adams,

10   Your Honor.

11          THE COURT:  You may step down.

12          MS. FREEMAN:  Your Honor, I would call Nancy Cutts.

13      NANCY CUTTS, the witness, having been duly sworn, testified

14   as follows:

15                        DIRECT EXAMINATION

16   BY MS. FREEMAN:

17   Q.   Mrs. Cutts, your last name is spelled C-U-T-T-S?

18   A.   That's correct.

19   Q.   And what is your relationship to Mr. Dean?

20   A.   Furman is my nephew.  He is the son of my oldest brother,

21   Jack Furman Dean, Sr., now deceased.

22   Q.   And I don't want to ask your age, but are you close in age

23   to Jack Dean, the defendant?

24   A.   I am close.  I'm 64.

25   Q.   Okay.  Were you raised near him when you were both growing

1  up?

2  A.  Yes.  He and I were raised up near Legrand, Alabama.  He

3  lived just up on the next hill from us.

4  Q.  As you were growing up, how often did you see him and have

5  contact with him?

6  A.  I probably saw Furman at least every other day if not every

7  other day.  Roughly, I guess -- five years older than he, and we

8  played a lot together because there were not many children in

9  our neighborhood.

10  Q.  And do you still live in that area or --

11  A.  I live here in Montgomery.

12  Q.  How long -- have you both lived in Montgomery at the same

13  time for the last several years?

14  A.  Oh, yes.

15  Q.  So how many years have you both lived in Montgomery?

16  A.  I've lived in Montgomery since 1963.

17  Q.  And was he here at that time, too?

18  A.  Yes.

19  Q.  So during the times these last 40 years when you've both

20  lived in this community, how often have you seen him?

21  A.  We have not seen each other very often.  We became involved

22  in our own families, I guess, and we basically saw each other at

23  family reunions, family gathers -- gatherings.

24  Q.  And would those events be held a couple of times a year at

25  least?

1  A.   Probably.   Once in the summer and then around Christmas

2  time.

3  Q.   What do you know of Jack Dean's life during the time he's

4  lived here as an adult in Montgomery?

5  A.   I felt he loved his family.   I knew he worked three jobs at

6  times to support them.   I just thought he loved his family.

7  Q.   Have you ever called on him for help or support in any of

8  your life events?

9  A.   No, but I knew he was there if I needed him.

10 Q.   And can you describe the kinds of jobs that he held?

11 A.   He drove the school bus for the Montgomery public school

12 system, he was a barber, and I believe he cleaned a church at

13 one time.

14 Q.   And did you ever have occasion to visit with the rest of his

15 family?

16 A.   Yes.   His mother I visited some.   Visited some with his

17 sister.

18 Q.   And do you know of their relationship with him?

19 A.   I think their relationship was strong.   They had a bond,

20 especially after his dad died.

21 Q.   Now, do you know his mother well?

22 A.   I do.

23 Q.   Would that be Carolyn Dean?

24 A.   That would be Carolyn Dean, yes.

25 Q.   And am I correct that she's in her late seventies?

1   A.   I believe that's correct.

2   Q.   And are you also aware of what her physical health is?

3   A.   I think she's declining somewhat.

4          MR. STUMP:   Note an objection to the relevance of this

5   line of questioning.

6          THE COURT:   Overruled.

7   BY MS. FREEMAN:

8   Q.   Did you have any discussion with her about whether or not

9   she could be here today?

10  A.   No, I did not discuss that with her.

11  Q.   What has been your opinion in the past of Jack Dean as a

12  person you've known and loved for all these years?

13  A.   I love Furman.  He's my nephew.  I'm shocked at what I hear

14  in the court today, but that doesn't keep you from loving

15  someone.  And in the past, I guess I've not understood that, how

16  people could love someone when they were accused of such

17  horrendous acts, but people are people and they do wrong

18  sometimes.  But you still love them.

19          MS. FREEMAN:   No other questions, Your Honor.

20          THE COURT:   Thank you.  Do you have any cross?  I'm

21  sorry.

22          MR. STUMP:   No, sir, Your Honor.

23          THE COURT:   Thank you.  Next witness.

24          MS. FREEMAN:   Linda Adams, Your Honor.

25          THE COURT:   Ms. Adams.

1      LINDA ADAMS, the witness, having been duly sworn, testified

2  as follows:

3                          DIRECT EXAMINATION

4  BY MS. FREEMAN:

5  Q.  Ms. Adams, could you please tell the Court who you are and

6  what your relationship is with Jack Dean.

7  A.  My name is Linda Gail Dean Adams.  I'm sorry.

8            THE COURT:  Would you like some tissue?  Oh, she has

9  some.

10 A.  I am his sister.

11 Q.  And are you older or younger than your brother, Jack Dean?

12 A.  I'm younger.  I'm three and a half years younger.

13 Q.  Where do you live?

14 A.  I live in Andalusia.

15 Q.  And are you employed outside the home in Andalusia?

16 A.  Well, me and my mother do houses.

17 Q.  And is your mother Carolyn Dean?

18 A.  Pardon?

19 Q.  Your mother is Carolyn Dean?

20 A.  Yes, she is.

21 Q.  When you say you do houses, can you describe what that

22 means.

23 A.  Well, we clean several -- you know, a few houses, several

24 houses together.

25 Q.  Do you have any children?

1    A.   Yes, I do.   I have three girls.

2    Q.   And this is your husband, Ron, who testified just a few

3    moments ago?

4    A.   Yes, ma'am.

5    Q.   Can you tell me what kind of work Ron does.

6    A.   My husband works at Shaw Industries down in Andalusia.   It's

7    a place that makes material that makes carpet.

8    Q.   During the time that you have lived in Andalusia, have

9    you continued to have close contact with your brother, Jack

10   Dean?

11   A.   Yes, ma'am.  Yes, ma'am.  He used to cut my hair, and I

12   would go over sometime and me and him would have lunch sometimes

13   together.

14   Q.   Has he ever offered assistance or help to you since you-all

15   have been adults?

16   A.   Well, when my children were little, there was a time that we

17   couldn't afford to buy our children Christmas, so my brother

18   bought every one of my girls Christmas.

19   Q.   Do you have any other brothers or sisters?

20   A.   No, I don't.   It's just me and him.

21   Q.   Was there a period of time when your brother lived with you

22   as an adult?

23   A.   Yes, ma'am.  When him and his first wife separated, we all

24   moved in together, you know, and we helped one another.

25   Q.   Now, were his two older children with him at that time?

```
 1  A.  Yes, ma'am.
 2  Q.  So am I correct that he had custody of his son and daughter
 3  from his first marriage?
 4  A.  Yes, ma'am.
 5  Q.  How old were they?
 6  A.  At that time?
 7  Q.  Yes, ma'am, at the time you moved in -- you were all
 8  living --
 9  A.  To be honest, I don't remember.  I really don't.
10  Q.  Were they in school?
11  A.  They were before school.  Yes, ma'am.  They were young -- it
12  was before they went to school.
13  Q.  So they were preschoolers?
14  A.  Yes, ma'am.
15  Q.  Okay.  And were you married at that time?
16  A.  Yes, I was.
17  Q.  And so you and Ron Adams and your three daughters and Jack
18  Dean and his two preschool children lived together for a time?
19  A.  Right.
20  Q.  Did Mr. Dean help you and your husband with anything during
21  that time?
22  A.  Only that time that stands out in my mind.  I'm sure there
23  are several times he did, because we were all really more or
24  less to help each other.
25  Q.  Was there ever a time when you had any concerns about your
```

1  children that you went to Mr. Dean about?

2  A.   No, ma'am.

3  Q.   Was there any time when he helped any of your children with

4  any of their growing-up issues?

5  A.   My youngest daughter, she got married.  She was married to a

6  boy that was into drugs, and she got into it, too.  And my

7  brother came all the way down there, and he talked to his

8  niece.  And if it hadn't been for my brother and seeing him the

9  way that he was concerned, the love and the compassion he had

10 for my daughter -- he knew -- he knew that his niece was in

11 trouble, and he asked her to please stop doing what she was

12 doing.

13 Q.   Can you tell the Court who else is present in the courtroom

14 today?  You've been --

15 A.   My children?  My oldest daughter is Amanda.  She's here.  My

16 next to the oldest is here, Wanda, and then my youngest is

17 Christy.

18 Q.   And all three are present here in court?

19 A.   Yes, ma'am.

20 Q.   Okay.  And do you know the other people who are sitting here

21 near your daughters?

22 A.   The other -- that are sitting with her?

23 Q.   Yes, ma'am.

24 A.   That is Jake's wife that's beside my daughter.  That's

25 Jake's mother, Sandy, and that's Amy, Jack's daughter.  That's

1   Jack, Jr. or the third, and that's Christy beside my husband,

2   and that's Ron Adams.

3           MS. FREEMAN:  No other questions, Your Honor.

4           THE COURT:  Anything from the government?

5           MR. STUMP:  No, sir.

6           THE COURT:  I have a question.

7           THE WITNESS:  Sure.

8           THE COURT:  I think you've pretty eloquently said why

9   you still love your brother.

10          THE WITNESS:  I do.

11          THE COURT:  And I remember the comments that the victim

12  made about how she hoped that no one would say that she had

13  taken a father away from his children.  I would assume that that

14  love for your brother extends to the victim as well?

15          THE WITNESS:  Yes, it does.

16          THE COURT:  And I would assume that the people you've

17  mentioned, including yourself, will continue to love the victim

18  just as much as you love your brother?

19          THE WITNESS:  I do love her.  Yes, I do.  I know -- I

20  have had numerous conversations with my brother, and I know that

21  he feels -- I don't think anybody could punish him more than

22  he's doing it to himself.  My brother is a -- he -- this past

23  year, he has gotten in with the Lord.  I know he's gotten away

24  from the Lord, but he is back with the Lord.  And I know there's

25  things that -- I know what he has done, sir.  I know what he's

1    done.

2           THE COURT:  Right.  Well, I really wanted to get more

3    at your feelings towards the victim of this.

4           THE WITNESS:  I don't agree with what's happened.

5    Okay?

6           THE COURT:  You say you don't agree with what's

7    happened.  What --

8           THE WITNESS:  I don't agree, and I know my brother

9    knows what he has done.  I know -- I don't know everything, you

10   know.  I won't ever know everything.  But I do feel the hurt.

11          THE COURT:  Yes.

12          THE WITNESS:  I do.

13          THE COURT:  Well, there is no question that she is

14   entitled to your unmitigated, full love.

15          THE WITNESS:  Yes, sir.

16          THE COURT:  I can assure you of that.  I have seen the

17   evidence.  And she is entitled to be loved by you, perhaps even

18   more so than anyone else in light of what she's gone through.  I

19   think she is an incredible woman.  I admire her a lot.  And of

20   all the people in this courtroom, I'll tell you, one of the

21   people I admire the most, if not the most, is the victim in this

22   case.  And I think you should, too.  Take my word on that.  And

23   I hope that everyone here on that side of the courtroom knows

24   just what a remarkable woman she is.

25          Thank you.

```
 1          MS. FREEMAN:  Your Honor, I call David Ghostley.
 2          THE COURT:  Yes.
 3      DAVID GHOSTLEY, the witness, having been duly sworn,
 4  testified as follows:
 5                      DIRECT EXAMINATION
 6  BY MS. FREEMAN:
 7  Q.  Dr. Ghostley, could you please describe your professional
 8  role.
 9  A.  Yes.  I'm a licensed psychologist in the state of Alabama.
10  A certified forensic examiner by the state of Alabama.  I
11  interviewed Mr. Dean at the Montgomery jail and did a
12  psychological evaluation.
13  Q.  And where did you obtain your -- you have a Ph.D; is that
14  correct?
15  A.  Yes.  I earned my doctorate at Argosy University in Atlanta,
16  Georgia.  Did a lot of -- did a couple years of practical work
17  at Emory University.  Did a forensic internship at
18  Chattahoochee, Florida.  Stayed on there for another year,
19  completed my doctorate, went on and did about eight months as a
20  prison psychologist, and then I've been now in private practice
21  for roughly five years.
22  Q.  And what prison were you assigned to when you were working
23  as a prison psychologist?
24  A.  I was the supervising psychologist at both Ventress and
25  Easterling.
```

1  Q.  What is required to obtain a license from the state of

2  Alabama as a clinical psychologist?

3  A.  You have to pass -- well, you have to have a doctorate in

4  psychology, a Ph.D, SID, or an Ed.D.  You have to pass a

5  national exam that has a probably 50 percent fail rate the first

6  time.  And then you have to pass a state law exam as it pertains

7  to the practice of psychology.

8  Q.  And what is required to obtain a certificate or to be

9  certified by the state of Alabama as a forensic examiner?

10  A.  That is a three-day course in law pertaining to forensic

11  evaluations, and it -- you have to pass two examinations at the

12  end of that three-day period.

13  Q.  Now, are you required to engage in any certain type of

14  employment or continuing education in order to maintain your

15  certifications from the state of Alabama?

16  A.  Yes.  I have to provide the state department of mental

17  health and mental retardation four reports a year, and I have

18  to -- and I attend a continuing education class at Taylor Hardin

19  Secure Medical Facility in Tuscaloosa once a year in addition to

20  keeping up my CEUs from my clinical license.

21  Q.  And CEUs are your continuing education units?

22  A.  Yes.  We have to have 20 a year.

23  Q.  While you were at Ventress, what was the nature of your

24  professional work?

25  A.  I was -- I supervised the mental health staff there:  A

 1  psychiatrist, a registered nurse, an admin person at both

 2  facilities -- the staffs were different -- and a counselor, a

 3  counselor also there.  The staffs were slightly different at

 4  each facility.  We would share psychiatrists sometimes.  The

 5  facilities are located maybe 30 miles apart in Clio and Clayton,

 6  Alabama.

 7  Q.  Were you involved there in providing treatment --

 8  A.  Yes.

 9  Q.  -- or in --

10      Were you also involved in providing assessment for

11  corrections purposes?

12  A.  This was mostly treatment oriented.  Did some assessment,

13  but very little.

14  Q.  Since you have been in private practice, have you routinely

15  provided or conducted forensic examinations?

16  A.  The bulk of my practice is clinical work.  I see people with

17  insurance that have problems, you know, depression being one of

18  the most common things that I assess.  People -- assessment is

19  what I do mostly.  I do also provide counseling and

20  psychotherapy for people.  That's the bulk of my work.  This is

21  probably, you know, 15 percent of my work, maybe 20.

22  Q.  When you say this, you're referring to the type of

23  examination you conducted for Mr. Dean?

24  A.  The forensic type, yes.

25  Q.  Now, in reviewing and meeting with Mr. Dean, what -- in --

1  excuse me.  Let me back up.  In the course of your professional

2  work, do you use assessment tools; that is, to a lay person, I

3  guess, I would call it a questionnaire or form --

4  A.  Yes.  We try to use standardized instruments to help us in

5  making predictions and to help us be more comprehensive.  A lot

6  of times some of these questions -- some of these instruments

7  will ask questions that we wouldn't get to during the course of

8  an evaluation, or we just might leave out, human error, so we

9  get sometimes more thorough with the instruments that we use.

10 Q.  And when you met with Mr. Dean, what instruments or

11 assessment tools did you use?

12 A.  I used two instruments that predict recidivism where sexual

13 offenses have occurred.

14 Q.  And what are those two instruments?

15 A.  I used the Minnesota -- I don't have my report right here.

16 I'm not recalling the name of it.

17        MS. FREEMAN:  Your Honor, may I approach?

18 A.  The MSOST is, I believe, the acronym used for that test.

19 Minnesota Sexual Offender Screening Tool Revised.  I used that

20 one and the Static 99.

21 Q.  And what is the -- are both of those geared towards

22 assessing recidivism?

23 A.  Yes.

24 Q.  And can you describe what you would mean as recidivism in

25 the case of a sexual offender?

1   A.   What you're trying to do is predict a likelihood or the

2   likelihood that the accused would reoffend if released.

3   Q.   Have you used those instruments in the past with other

4   people?

5   A.   Yes, but very limited.

6   Q.   And can you tell us what use or weight is given to them by

7   members of your profession?

8   A.   The weight?   These two are very commonly used in court

9   proceedings.   In consultation with a couple of more experienced

10   psychologists that I know in the field, recommended these two

11   tests.

12   Q.   And when you used those tests with Mr. Dean, what did they

13   determine?

14   A.   They found a less-than-average risk of reoffending, but

15   there -- they can't guarantee that he's not a risk at all.

16   Q.   Is there any instrument on the planet that can make a

17   guarantee --

18   A.   No.

19   Q.   -- regarding human behavior?

20   A.   No.   They can only give a statistical prediction.

21   Q.   And I'm looking at page three of your report.   Is it correct

22   that the statistical prediction reached by the Static 99 was

23   that Mr. Dean had less than a five percent chance of recidivism

24   during his first five years?

25   A.   Yes.   The verbiage they use is less than five percent chance

1    of sexual reconviction.  I'm not sure if recidivism and

2    reconviction are the same thing.

3    Q.   And was the Minnesota Sexual Offender Screening Tool also

4    similarly reaching a conclusion that he had a less-than-average

5    risk --

6    A.   Yes.

7    Q.   -- or a low risk of recidivism?

8    A.   That's right.

9    Q.   Now, based on your interview with him and your use of those

10   tools in the past and at that time, do you believe that that

11   conclusion is reliable to the extent that any instrument can

12   make such a recommendation?

13   A.   Yes.  It has a -- there is a reliability to this, and I want

14   to say it's roughly 40 percent reliable.

15   Q.   Now, during your interview with Mr. Dean, am I correct that

16   you also discussed the offense and his personal background with

17   him?

18   A.   Yes.

19   Q.   And can you tell the Court whether or not he expressed any

20   responsibility for the charges he was facing?

21   A.   Yes, he did.  He expressed remorse and said that he wanted

22   to face the responsibility for what he's done.

23   Q.   Do you believe that he has any psychological disorder at the

24   present time that would pose a danger to the community?

25   A.   Not to the community.

1  Q.  Would it pose a danger to him?

2  A.  No, not to him.

3  Q.  Does he need mental health treatment?

4  A.  I believe he does.

5  Q.  And what would be the nature of the treatment he needs?

6  A.  I believe he could use some intensive counseling and, you

7  know, maybe insight-oriented therapy so that he could understand

8  triggers and prevent future occurrences, although I feel that

9  any future occurrence would be limited to just one person.

10  Q.  Now, just before we went on the break, the Court asked you a

11  few questions.  And also let me state, you were in here during

12  the review of the CD --

13  A.  Yes, I was.

14  Q.  -- DVD.  So you watched the images that we've been

15  discussing in court.

16  A.  Yes, I did.

17  Q.  And have you also reviewed the presentence report in this

18  case?

19  A.  Yes.

20  Q.  Does either the contents of the presentence report or the

21  images that you saw change the conclusions you reached in your

22  written report?

23  A.  Not necessarily.

24  Q.  Now, not necessarily sounds like maybe.

25  A.  Yes, that's --

1          THE COURT:  I thought that, too.

2   Q.  So what does that mean?

3   A.  Mr. Dean asserts that he loves the victim in this case.  And

4   from the perspective of -- if there is such a thing as a normal

5   sexual human being, what I saw on the tapes appeared torturous

6   and heinous, really; but at the same time, there are groups of

7   people that willingly do these sorts of things and act out these

8   kinds of scenarios in order to achieve heightened levels of

9   sexual arousal.  I don't know this case well enough to say that

10  that's what they're doing.  I have not had the opportunity to

11  interview the victim.

12          THE COURT:  I don't quite understand that comment.  How

13  can -- first, let me ask you this:  Is there any evidence that

14  he had had a relationship with -- is there any evidence that the

15  victim had had a sexual relationship with anyone else?

16          THE WITNESS:  Just the husband.

17          THE COURT:  No, the victim.  Other than her stepfather

18  during this period of time.

19          MS. FREEMAN:  Your Honor, there are references in the

20  presentence report to that.

21          THE COURT:  Okay.  Well, during the ages of 11, 12, and

22  13.

23          THE WITNESS:  Oh, no.  No, sir.

24          THE COURT:  Okay.  Then how could it be that the victim

25  could in any way be held accountable for this type of sexual

 1   arousement?  Because she would have had to have learned it from

 2   the defendant.

 3              THE WITNESS:  I recall seeing -- I guess the one scene

 4   that I was bothered most by, I think she was 27 years old.

 5              THE COURT:  I'm talking about when she's 13, 12, 13,

 6   14, and 15.

 7              MS. FREEMAN:  Your Honor, may I clarify my question?

 8              THE COURT:  Pardon me?

 9              MS. FREEMAN:  I just want to make sure my question was

10   understood.

11              THE COURT:  Understood?

12              MS. FREEMAN:  Yes, sir.

13              THE COURT:  Well, I actually interrupted him, because

14   he said something like how people get aroused by violence.

15              THE WITNESS:  Yes.

16              THE COURT:  And I'm saying that how could she have ever

17   learned this except from the defendant.

18              THE WITNESS:  Oh.

19              MS. FREEMAN:  But Your Honor, my understanding was that

20   he was describing Mr. Dean.

21              THE COURT:  Mr. Dean?

22              MS. FREEMAN:  Yes.

23              THE COURT:  Oh, okay, then.  Okay.  I thought maybe you

24   were including the victim, too.

25              THE WITNESS:  No, no.  No, sir.

1    THE COURT:  Oh, okay.

2  BY MS. FREEMAN:

3  Q.  And you have no opinion about the victim and no information

4  that would indicate she is other than a victim in this case.

5  A.  That's true.

6  Q.  In terms of Mr. Dean's stated belief to you -- and I'm

7  quoting from your report -- I loved her, and that's stated in

8  your report, have you treated people who express an opinion of

9  love towards other people, and yet have done damaging acts

10  towards those people?

11  A.  Oh, yes.  That's very commonplace.

12    THE COURT:  How do you separate that from just anybody

13  who rapes and pillages and claims it's love?

14    THE WITNESS:  I was thinking more along the lines of,

15  you know, a man is angry at his wife, who he loves dearly, and

16  he hits her or something like that.

17    THE COURT:  Arguably, that's true, but you've seen

18  these tapes.

19    THE WITNESS:  Yes, sir.

20    THE COURT:  Is there any indication or any way that you

21  could explain the conduct towards the victim other than just

22  heinous?  I mean, there's no compassion.  There's no feeling.

23    THE WITNESS:  That's true.

24    THE COURT:  I mean, he literally puts his finger up her

25  when she's asleep.

1          THE WITNESS:  Yes, sir.  That's true.  Uh-huh (positive

2    response).

3          THE COURT:  I don't see how you can call that anything

4    other than just heinous.

5          MS. FREEMAN:  Your Honor --

6          THE COURT:  I'm asking him.

7          THE WITNESS:  I think it was a violation.

8          THE COURT:  Okay.  So I don't see where love comes into

9    this.

10          THE WITNESS:  He reports that he was in love with her.

11          THE COURT:  Can you -- as I said during the recess

12   while we were looking at the tapes, can you reconcile his claim

13   of love with the conduct we saw on the tape?

14          THE WITNESS:  Not necessarily, sir.

15          THE COURT:  Go ahead.

16   BY MS. FREEMAN:

17   Q.  Have you known people who have loved other people and yet

18   done horrible, damaging things to them?

19   A.  Yes.

20          MS. FREEMAN:  No other questions, Your Honor.

21          THE COURT:  Cross?

22                        CROSS-EXAMINATION

23   BY MR. STUMP:

24   Q.  Good afternoon, Dr. Ghostley.

25   A.  Good afternoon.

1   Q.   My name is Nathan Stump.   I'm assistant United States

2   attorney.   You and I have met before.

3   A.   Yes.

4   Q.   I've found your testimony credible then and now.   I

5   appreciate you being here.

6        You said at one point that you -- that you did not believe

7   that this defendant was a danger to the community.   I think your

8   answer was not to the community.   And then the question was

9   posed whether he is a danger to himself, and you said, no, not

10  to him.

11  A.   Yes, sir.

12  Q.   All I want to ask you is, in your opinion, after reviewing

13  those tapes that we played and also interviewing the defendant

14  and what you know about this case, do you have an opinion about

15  whether this defendant poses a danger to anybody?

16  A.   I don't think he should be near the victim anymore.

17  Q.   Okay.

18           MR. STUMP:   Nothing further.

19           THE COURT:   Anything else?

20           MS. FREEMAN:   No, Your Honor.

21           THE COURT:   If his conduct towards the victim -- and

22  I'm saying if -- could not be characterized as love or

23  compassion, can one assume, then, that his conduct towards her

24  is purely one of lust and desire just to sexually abuse her?

25           THE WITNESS:   I would say yes.

1          THE COURT:  If that's true, then why should he be

2   around any girls?

3          THE WITNESS:  I don't think he -- I think the only

4   object of that sort of behavior was the victim in this case.  I

5   think he was around a number of children as a bus driver, as a

6   janitor in a church, around his nieces and so forth, and never

7   had any problems with any other children.

8          THE COURT:  Well, let me stop you there.  You and I saw

9   the tape.

10         THE WITNESS:  Uh-huh (positive response).

11         THE COURT:  We saw a toddler in one of those tapes, did

12  we not, walking across the screen while the victim is doing a

13  suggestive act?

14         THE WITNESS:  Yes, sir.

15         THE COURT:  We heard babies crying in the background in

16  some of those scenes.

17         THE WITNESS:  Yes, we did.

18         THE COURT:  We also saw a tape where the victim's

19  stepsister --

20         THE WITNESS:  Was filming.

21         THE COURT:  -- was taking pictures of her.

22         THE WITNESS:  That's true.

23         THE COURT:  And I think it's clear where she got the

24  camera.

25         THE WITNESS:  I do, too.

```
 1          THE COURT:  How can you say that he is not a threat to
 2   other children?
 3          THE WITNESS:  I guess I was meaning more of a physical
 4   or sexual threat to other children.  I do believe that that was
 5   emotional abuse for him to be doing that with other children
 6   around as well as to the victim.
 7          THE COURT:  Anything else?
 8          MR. STUMP:  Your Honor, I have just one follow-up
 9   question or a couple of follow-ups.
10   BY MR. STUMP:
11   Q.  Dr. Ghostley, in anything that you reviewed, did you learn
12   that this defendant had also videotaped another young woman at
13   any point?
14   A.  I don't know of anything like that.
15   Q.  Okay.  Did you know or did you look at any videos in which
16   the defendant went on vacations and filmed other women?
17   A.  All I saw was the compilation today.  I've got a part in my
18   report that outlines the data sources that I used to write my
19   report.  I just saw the preinvestigation report today as well.
20   Q.  If you knew -- Let me change the question.
21   A.  Okay.
22   Q.  If you knew that this defendant had videotaped other young
23   women in suggestive ways -- for instance, through the crack of a
24   bathroom door, through an open window, across a neighbor's
25   fence, that kind of thing -- would that change your opinion in
```

 1  any way, have any impact on your --

 2  A.  It could.  It very likely could, yes.

 3          MR. STUMP:  Nothing further.

 4          THE COURT:  Thank you, unless Ms. Freeman has some more

 5  questions.

 6          MS. FREEMAN:  No, I have no other questions.  Your

 7  Honor, we have no other proof.

 8          THE COURT:  Pardon me?

 9          MS. FREEMAN:  We have no other evidence to present.

10          THE COURT:  Anything else from the government?

11          MR. STUMP:  Your Honor, we would, just in rebuttal to

12  that, recall Corporal Duckett to the stand.

13          THE COURT:  Okay.

14      CORPORAL REGINA DUCKETT, the witness, having been duly

15  sworn, testified as follows:

16                          DIRECT EXAMINATION

17  BY MR. STUMP:

18  Q.  Corporal Duckett, you were just in court for Dr. Ghostley's

19  testimony, right?

20  A.  That's correct.

21  Q.  And you heard that last question I asked him about various

22  hypotheticals:  If there were videos of this or that, would that

23  change your opinion.  Did you hear that question?

24  A.  That's correct.  I did.

25  Q.  In the course of your investigation, did you find any

1  evidence that fits any of the hypotheticals I posed?

2  A.   Yes.   There were several videotapes involving family

3  vacations where the defendant would zoom in on a random female,

4  like at an amusement park or on the beach, either the breast or

5  the buttock area.   There are some videos involving other family

6  members where he did the same thing either at family gatherings,

7  in the pool area.   There was one instance where he was filming

8  outside of a bedroom window when the victim and one of her

9  cousins was changing clothing, and it was of -- they did become

10  nude, topwise, in that video.

11  Q.   And about what age were they in that video, do you

12  remember?

13  A.   I believe they were teenaged, I believe.

14  Q.   Anything else?

15  A.   No.

16          THE COURT:   Cross?

17          MS. FREEMAN:   Yes.

18                        CROSS-EXAMINATION

19  BY MS. FREEMAN:

20  Q.   Other than the last scene that you described, these people

21  were clothed; is that correct?

22  A.   In bathing suits or -- yes.

23  Q.   And this is --

24          MS. FREEMAN:   No other questions, Your Honor.

25          THE COURT:   Okay.   Anything else?

1            MR. STUMP:  No, sir.

2            THE COURT:  Okay.  We'll take a five-minute recess, and

3   we'll come back and I'll hear your arguments.

4        (Recess was taken at 2:27 p.m. until 2:36 p.m., at which

5   time the proceedings reconvened, as follows:)

6            THE COURT:  I'll hear from the government.

7            Well, actually, I'll hear from probation first and then

8   the government and then the defendant.

9            PROBATION OFFICER:  From probation?

10           THE COURT:  Yes.

11           PROBATION OFFICER:  As far as my recommendation?

12           THE COURT:  Yes.

13           PROBATION OFFICER:  Yes, sir.  The probation office

14   would recommend the maximum allowable sentence under the

15   sentencing guidelines of 30 years, which is 20 years on count

16   one to be followed by ten years consecutive on count two.

17           THE COURT:  Okay.  And that would be a guideline

18   sentence?

19           PROBATION OFFICER:  That would be within the guideline

20   range.

21           THE COURT:  Anything under 30 years would be -- would

22   not be a guideline sentence?

23           PROBATION OFFICER:  That's correct.

24           THE COURT:  Over 30 years would not be a guideline

25   sentence?

1          PROBATION OFFICER:  That's correct.

2          THE COURT:  Now, why do you recommend that sentence?

3          PROBATION OFFICER:  Well, Your Honor, after looking at

4    the circumstances of the instant offense, after further -- after

5    reviewing the tapes -- which I never have reviewed them, I just

6    simply read a summary prepared by someone else -- as one of our

7    former judges, Senior United States District Court Judge Robert

8    Varner, used to say all the time, I think he's worked hard for

9    it, and he's entitled to the maximum allowable sentence.  This

10   has been probably one of the most degrading and humiliating

11   child pornography offenses that I have personally reviewed, and

12   I've done at least about 15 in this district.  If any other

13   child pornography case would deserve the maximum, it would be

14   this one.

15         THE COURT:  Okay.  I'll hear from the government.

16         MR. STUMP:  Your Honor, the United States concurs with

17   the recommendation of the probation office.  Because of the way

18   the indictment was written and the charges were brought in this

19   case, there is a statutory maximum of 30 years.  The guideline

20   range for that statutory maximum would be life imprisonment.  We

21   would recommend life imprisonment, but we can't.  We're stuck

22   with 30 years, so we're recommending 30 years.

23         I second what Ms. Caple said.  I handle the bulk of the

24   child pornography cases from my office.  This is by far the most

25   disturbing.  The reason why, Your Honor, is that in most of the

1  pornography cases I have, there is a victim in a photograph; and

2  you look at a single photograph or maybe a video clip, and you

3  say, there's an instance where a child was abused by somebody

4  who should definitely know better, and it's disturbing, but

5  that's it.  And that child is presumably rescued or found

6  somewhere, or you at least have the peace of mind of knowing

7  that somewhere, somehow, they have found this child, and she's

8  okay.

9       In this case, Your Honor, the painful part about this

10  is watching the evidence that goes on and on and on from the

11  time she is little bitty, 11 or 12 years old, until the time she

12  is 27 years old.  And it goes on and on, and no one comes to

13  rescue her.  And that, Your Honor, I believe is extremely

14  important when considering whether to go below the 30 years,

15  below the guidelines in this case as the defense would like you

16  to do.

17       Your Honor, there may be a time when a defendant comes

18  into a courtroom, having committed this kind of conduct, and he

19  receives less than the statutory maximum.  But I am confident

20  that this is not that defendant, this is not that courtroom, and

21  this is not that day.  Thirty years, Your Honor.

22       THE COURT:  Ms. Freeman?

23       MS. FREEMAN:  Your Honor, I think that it's no question

24  that a 30-year sentence is a life sentence for Jack Dean if the

25  Court --

```
 1            THE COURT:  How old is he now?

 2            MS. FREEMAN:  Fifty-nine, Your Honor.  Sixty.

 3            THE COURT:  Sixty?

 4            MS. FREEMAN:  Sixty, Your Honor.

 5            I would also point out --

 6            Your Honor, I ask the Court to step back from this case

 7  for a moment.

 8            THE COURT:  To be candid with you, Ms. Freeman, I took

 9  recesses to do that.

10            MS. FREEMAN:  And I appreciate that.

11            THE COURT:  I think it's important to retain some

12  objectivity, and I think one has to step back.  I think you're

13  absolutely right.

14            MS. FREEMAN:  I also think that -- and I don't mean

15  this disrespectfully at all to Mr. Stump, but the rationale that

16  he described for why a single image of an unknown child is less

17  troubling is, in fact, not realistic and not, in fact, the

18  reality that many of those children experienced.  So I think in

19  many respects, no one in this room can say, in fact, this is the

20  worst thing that ever happened.

21            THE COURT:  You know what disturbs me the most -- and

22  you're getting to the point, and I'll pose it to you right now.

23  I've sat through a number of child pornography cases, both

24  during the trial and at sentencing.  And the defendants there

25  owned child pornography; that is, they possessed pictures with
```

 1   children in sexually explicit positions and so forth.  So there

 2   the defendant was guilty of having just owned the pornography.

 3   What is most disturbing about this case is I think this may be

 4   the first case I've had where the defendant actually did the

 5   pictures.

 6          MS. FREEMAN:  Yes, sir.

 7          THE COURT:  And not only did the pictures, but did

 8   pictures of torture.  And I have had a case where -- well, no, I

 9   haven't had one where the defendant did the pictures himself.

10   But the pictures of torture where -- and you heard it.  The

11   victim here was literally squealing and crying for help, saying,

12   stop, stop, stop.  And I'm not talking about when she's 27 years

13   old.  This is when she's a minor.  And literally just begging to

14   be -- for the torture to stop.

15          MS. FREEMAN:  And Your Honor, what I would say to that

16   is the statutory maximum for the production of that video and

17   those videos is 20 years.  That's the statutory maximum.  Not

18   30.  Twenty years.  The possession of child pornography is the

19   possession of that video; the possession of the videos that he

20   made.

21          THE COURT:  But the statutory maximum total here is 30

22   years, is it not?

23          MS. FREEMAN:  Only if the Court were to run it

24   consecutive.  And the fact is that the possession was part of

25   the production.  He would not have possessed those but for

 1    producing them.

 2           THE COURT:  But the -- I still don't see how I can get

 3    around ignoring that evidence.

 4           MS. FREEMAN:  Well, I think that --

 5           THE COURT:  And why, under 3353, I shouldn't.

 6           MS. FREEMAN:  Your Honor, first I think that the Court

 7    needs to acknowledge that he is facing three serious criminal

 8    charges in the state for this conduct.

 9           THE COURT:  That's another question.  Is he?

10           MS. FREEMAN:  Yes, he is, Your Honor.

11           THE COURT:  What are these charges and what's the

12    posture of those charges?

13           MS. FREEMAN:  As described in the presentence report,

14    he is charged with sexual torture, which is a class A felony

15    that carries from 10 years to life or 99 years.  He's charged

16    with sodomy in the first degree, which is also a class A

17    felony.  And he's charged with sexual abuse in the first degree,

18    which is a class C felony.  And according to the presentence

19    report, and it's my understanding those charges are still

20    pending, he has been here in custody all this time on a writ

21    from the state court.

22           THE COURT:  Do those charges include the incidents

23    while she was a minor or just the incident when she was 27 or do

24    you know?

25           MS. FREEMAN:  Your Honor, number one, I don't know.

1    Number two, I believe that there is not a statute of limitations

2    in the state system for sexual offenses against children.  So I

3    believe that they potentially could include those.

4            THE COURT:  Okay.

5            PROBATION OFFICER:  Your Honor, could I add to that?

6    I'm sorry.  I do have those listed under pending charges, but I

7    was told that the charges as to Mr. Dean were no-billed and that

8    they would proceed as to the case against Mr. Haigler.

9            THE COURT:  I actually saw that in the presentence

10   report, too, that the state charges were no-billed, and I was

11   going to ask about that later.  Why were they no-billed?

12           PROBATION OFFICER:  On the belief that we would proceed

13   in the federal offense.

14           MR. STUMP:  Your Honor, I've spoken with the deputy

15   district attorney with regard to Mr. Dean's state case, and

16   she's advised me that although they are prepared to go forward

17   in the state, that they were deferring to federal prosecution.

18   And based upon what they expect the sentence will be, they don't

19   have any plans to press charges after this date.

20           MS. FREEMAN:  All I know is, Your Honor, he's here on a

21   writ, and nobody has released him from state custody.

22           THE COURT:  Go ahead.

23           MS. FREEMAN:  Thank you, Your Honor.

24           So I think it's important to note that much of the

25   conduct that we are all reacting to that's depicted on these

1    videos are, in fact, the state law offenses.  What he's here for

2    is producing these videos, and the statutory maximum for that

3    offense is 20 years.

4         I think it's also important to just acknowledge the

5    history of the sentencing guidelines as it relates to sex

6    offenses.  When the Supreme Court adopted *Booker*, they talked

7    about -- and particularly in the *Kimbrough* case, they discussed

8    why the sentencing guidelines took effect; what the purpose of

9    the guidelines initially was; what the role of the commission

10   was.  They talked about the fact that the guidelines were to

11   create a system of punishment which was proportional, which

12   controlled crime through incapacitation and deterrence, and

13   which addressed rehabilitation.  And the commission was set up

14   to use data on past practices and recidivism in formulating the

15   guidelines.

16        The original guidelines were based on calculations

17   based on a review of over 10,000 presentence reports.  However,

18   over time the guidelines relating to child sex offenses have

19   been changed numerous times, increased numerous times, not on

20   the basis of empirical data gathered by the commission, but in

21   response to congress simply changing the law and knee jerk

22   reaction as to the law.

23        Thus, the first offense, the production, was not even a

24   federal law violation.  And I think the state would agree that

25   that production was not an offense at the time the original --

```
 1   not a federal law offense at the time of the acts depicted that
 2   we saw here today, before 2003.  It was only the duplicating of
 3   a video that had been made in 1992 that created a federal
 4   offense.  And the only way that the government can even
 5   establish that that federal offense fell under the 2003 law was
 6   by tracking the date of the physical material onto which it was
 7   duplicated.  So the fact is that these harsh guidelines were not
 8   always this harsh for this type of conduct, and they have been
 9   raised, not in response to any new understanding of sex offenses
10   or new understanding of the purposes of sentencing, but simply
11   in response to congressional directives that are not based on --
12          THE COURT:  What is your response, though, to the fact
13   of this case, that the guideline sentence is actually life?  If
14   I were applying a guideline sentence, I should be giving him
15   life.  Arguably, as you said before, because of his age, he
16   might, in effect, be getting a life; but to the extent you're
17   arguing about how the guidelines are unreasonable, in this case,
18   because of the statutory maximum, he's actually getting a
19   sentence that is significantly below the guidelines.
20          MS. FREEMAN:  Your Honor, I think that's a hypothetical
21   construct, because clearly 30 years is life for Mr. Dean.  And
22   it --
23          THE COURT:  But hypothetical concept is what you're
24   talking about when you argue about what the commission did.
25   That's what we're talking about here.  It's how the commission
```

 1   acted, not about this particular defendant.  So what I'm trying

 2   to do now is say, well, let's delete the defendant from the

 3   picture and talk about the commission.  Here he should be

 4   getting life if we're talking about the guidelines.

 5        MS. FREEMAN:  Well, I think that in -- when we're

 6   operating in a system where there is no parole, for most

 7   defendants who enter the system, there is no difference between

 8   life and 30 years.

 9        THE COURT:  Okay.

10        MS. FREEMAN:  Your Honor, I would also point out that

11   the guidelines for the second offense, as the presentence report

12   notes on page -- I think it's on page -- page nine and paragraph

13   20 --

14        THE COURT:  This is of the presentence report?

15        MS. FREEMAN:  Yes, sir.  The guideline range for the

16   possession under the 2007 guidelines was --

17        THE COURT:  Wait a minute.  What page are we looking

18   at?

19        MS. FREEMAN:  I'm looking at page nine, the top

20   paragraph, paragraph 20, the last line.

21        THE COURT:  I have it here.

22        MS. FREEMAN:  The guideline for the possession itself,

23   which occurred in 2007, is 35.  And that's before acceptance of

24   responsibility, which would reduce it to 32.  32 is 121 to 151

25   months.  So, again, it's a production that occurred before

1  congress even made that a federal law violation, and possession

2  that under the present guidelines, as harsh as they are, tops

3  out at 151 months.  In addition, if this had been charged -- and

4  I'm not saying that the government is dilatory in any way.

5  But obviously, the guidelines in effect when the conduct took

6  place that even brings it within the jurisdiction of this Court

7  in 2003 and 2004, those guidelines for count one would have

8  placed the sentencing range at 27 for a range of 70 to 87

9  months.

10        Now, there is just simply nothing that has happened in

11  our knowledge of sentencing or of the nature of this offense

12  that has led to any general consensus at all, and certainly to

13  no data before the sentencing commission that says a sentence --

14  an offense that was worth 70 to 87 months in 2003 is now worth

15  30 years to life five years later.  And --

16        THE COURT:  That would only be as to count one, right?

17        MS. FREEMAN:  Yes, sir.

18        THE COURT:  What would be 20 years?

19        MS. FREEMAN:  Count one would be 70 to 87 months.  The

20  present guideline range for count two would be 32, which is 121

21  to 151 months.

22        THE COURT:  Well, let's just hypothetically talk about

23  if the Court had before it count one as it existed in 2003.

24        MS. FREEMAN:  Yes, sir.

25        THE COURT:  That would be the guideline range of 70 to

1   87 months?

2           MS. FREEMAN:  Yes, sir.

3           THE COURT:  I still can't close my eyes to the torture

4   in this case.  What's your argument that I shouldn't vary upward

5   based on that alone?

6           MS. FREEMAN:  Your Honor, first of all, the torture

7   that we saw today occurred after the age of 18.

8           THE COURT:  No.  The spanking was before 18.  And she

9   was squealing.

10          MS. FREEMAN:  Yes, sir.

11          THE COURT:  I saw that.

12          MS. FREEMAN:  Your Honor, I'm not arguing with the

13   Court.

14          THE COURT:  He was hitting her so hard that she was

15   just crying.  She was literally crying for help.

16          MS. FREEMAN:  I withdraw the statement.

17          THE COURT:  She was begging him to stop.

18          MS. FREEMAN:  Yes, sir.

19          THE COURT:  And he just kept at it and kept at it and

20   kept at it.  I can't capture in words what he did to her.  My

21   words are inadequate.  But go ahead.

22          MS. FREEMAN:  The fact is that that is a state law

23   violation.  And what the Court has --

24          THE COURT:  The fact is that before -- even under the

25   2003, I could have given him a variance for that conduct.  So

1    you still haven't closed my eyes to that conduct.

2           MS. FREEMAN:  I understand that, Your Honor.  The

3    statutory maximum, however, was 20 years.

4           THE COURT:  Right.

5           MS. FREEMAN:  There was no mandatory minimum at that

6    time, I believe, and the guideline range was 70 to 87 months.

7    And that's with an enhancement for the conduct that we saw

8    today.

9           I have nothing further to say, Your Honor.

10          THE COURT:  Thank you.  Anything else?  I think

11   Ms. Freeman is right.  I think I should be objective.  I'll take

12   another five minutes, and then I'll announce the sentence,

13   unless you have something else.

14          MR. STUMP:  Your Honor, may I add one thing before you

15   go, and that is, we were certainly hamstrung in this case.  I

16   want to make sure everyone in the gallery understands and Your

17   Honor understands that we -- there is a federal statute that

18   prohibits the production of child pornography.  It's 18 USC

19   Section 2251.  We were hamstrung in our ability to charge

20   Mr. Dean with a violation of that statute because at the time

21   that the conduct occurred, the statute as written did not allow

22   for federal jurisdiction based upon the movement of the

23   materials that were used to produce that depiction in interstate

24   commerce.  That didn't come until 1998, which, coincidentally,

25   was the year that the victim turned 18.  Had we been able to

1    charge this defendant with a violation of Section 2251, we would

2    have no doubt charged him with that for each and every instance

3    that this occurred.  At the time that the conduct took place,

4    the statutory maximum for 2251 was ten years.  Today it's a

5    15-year minimum.  Back then we would have charged him with

6    multiple counts of 2251 and stacked them, ten years for each

7    one, and he would be looking at well over 30 years as a

8    potential penalty.  So 30 years, in the government's

9    estimation --

10            THE COURT:  Ms. Freeman's point is, though --

11            MR. STUMP:  Your Honor, I believe her point is that the

12   guidelines --

13            THE COURT:  She's just saying that the statute and the

14   guidelines have changed, and there's no empirical evidence to

15   support the change.

16            MR. STUMP:  And what I want to say, Your Honor, is that

17   she's talking about the specific charge in this case.  But if

18   the Court looks at the underlying conduct at issue, that conduct

19   was prescribed by 2251 a long time ago, and there were penalties

20   set in place for that a long time ago.  And those penalties, if

21   that statute could have been charged and was charged, would have

22   added up to much more than 30 years in this case.  So there -- I

23   believe that that argument that this is somehow a bigger

24   sentence than he would have received back then is in itself a

25   fallacy.

 1            MS. FREEMAN:  And Your Honor, I think -- I disagree

 2   with that because when he says if it could have been charged, it

 3   would have been charged, the fact is it can't be charged.  It

 4   could not be charged.  And so that's where we are.  That -- what

 5   he says, as if this were a different world, he would be facing

 6   more time.  It's not a different world.  He's not facing that

 7   time.  They couldn't charge that.  What the Court has to

 8   consider is what they could charge and how there is now a

 9   dramatic increase in the penalty for no reason at all.

10            THE COURT:  Thank you.  We'll take a five-minute

11   recess.

12        (Recess was taken at 2:57 p.m. until 3:07 p.m., at which

13   time the proceedings reconvened, as follows:)

14            THE COURT:  Will the defendant stand at the lectern

15   with his attorney.

16            Now, the offense level here, Ms. Caple, is it 45 or

17   43?

18            PROBATION OFFICER:  It is now 43.

19            THE COURT:  Okay.  The fine range remains the same; is

20   that correct?

21            PROBATION OFFICER:  Yes, sir.

22            THE COURT:  Okay.  Mr. Dean, I will now announce the

23   proposed sentence.  I will give you another opportunity to make

24   comments before I decide whether to impose the sentence as

25   announced.

1          In compliance with *United States v. Booker*, this Court,

2   while not bound to apply the guidelines, has consulted them and

3   has taken them into account on the issue of the appropriate

4   range of sentence to be imposed in this case.  Having made

5   findings as to the objections to the presentence report, the

6   Court finds that the offense level is 43, the criminal history

7   category is I, the authorized guideline sentence for count one

8   is 20 years, and the authorized guideline sentence for count two

9   is 10 years; the authorized term of supervised release for count

10  one is two to three years, and the authorized term of supervised

11  release for count two is any term not less than five years, up

12  to and including life.  The fine range for this offense is

13  25,000 to $250.

14          Before I do this, is there anything that he wanted to

15  say to me before I announce the sentence?

16          THE DEFENDANT:  Yes, sir.  I just want to tell Your

17  Honor and --

18          THE COURT:  Speak a little bit more slowly so that I

19  can hear you.

20          THE DEFENDANT:  I just wanted to ask the victim for

21  forgiveness.  I'm sorry that I put her through all of that

22  torture, and I'm -- I'm terribly sorry that -- I don't know what

23  come over me.  I just -- it was -- I should have never done them

24  cruel things and everything.  I'm so sorry that I did that.  I

25  just want my family over here to know that I'm the one that did

1   all of this, and I'm just so sorry for it.  I've got God in my

2   life now, and I'm hoping that the victim will forgive me for

3   what I've done to her over the years.

4         That's all I've got to say.

5         THE COURT:  The fine range is from 25,000 to $250,000.

6         Having considered and consulted the sentencing

7   guidelines and evaluated the reasonableness of a sentence

8   through the lens of Title 18 United States Code Section 3553, it

9   is the order, judgment, and decree of the Court that the

10  defendant, Jack Furman Dean, is committed to the custody of the

11  Federal Bureau of Prisons to be imprisoned for a term of 360

12  months.  This term consists of terms of 240 months as to count

13  one and 120 months as to count two, to be served consecutively

14  to the term imposed on count one.  The Court finds the sentence

15  imposed is sufficient but not greater than necessary to comply

16  with the statutory purposes of sentencing, in particular those

17  factors found in Section 3553(a), such as the nature and

18  circumstances of the offense; the history and characteristics of

19  the defendant; to reflect the seriousness of the offense; to

20  promote respect for the law; to provide just punishment for the

21  offense, and to protect the public from further crimes.  And

22  there are other factors listed in 3553(a) that the Court has

23  considered as well.

24        The Court recommends that the defendant be designated

25  to a facility where sex offender treatment is available.

1        It is further ordered that upon release from
2   imprisonment, the defendant shall be placed on supervised
3   release for a term of life.  The term consists of terms of three
4   years as to count one and life as to count two, such terms to
5   run concurrently.
6        Within 72 hours of release from custody, the defendant
7   shall report to the probation office in the district to which he
8   is released.
9        It is further ordered that while on supervised release,
10  the defendant shall comply with the mandatory and standard
11  conditions of supervised release on file with the Court.
12       The Court also orders the following special
13  conditions:  The defendant shall register as a sex offender
14  as required by law.  The defendant shall participate in a
15  program approved by the United States Probation Office for the
16  treatment and monitoring of sex offenders.  The defendant
17  shall have no contact with children under the age of 18 and
18  will refrain from entering into any place where children
19  normally congregate without the written approval of the
20  Court.  The defendant shall have no direct or indirect contact
21  with the victim in this case.  The defendant shall not possess
22  any form of pornography, sexually stimulating, or sexually
23  oriented material depicting children under the age of 18.  The
24  defendant shall not enter any location where such pornography
25  or erotica can be accessed, obtained, or reviewed.  The

1    defendant shall not possess a computer or any device that can

2    access the Internet, except that the defendant may, with the

3    approval of the probation officer, use a computer in connection

4    with authorized employment.  The defendant shall consent to

5    third-party disclosure to any employer or potential employer

6    concerning any computer-related restrictions that are imposed

7    upon him.  The defendant shall submit to a search of his person,

8    property, house, residence, vehicle, papers, computer, or other

9    electronic communications or data storage devices or media and

10   consents to search at any time with or without a warrant by any

11   law enforcement or probation officer with reasonable suspicion

12   concerning a violation of a condition of supervised release or

13   unlawful conduct and by any probation officer in the lawful

14   discharge of the officer's supervision functions.  The defendant

15   shall pay to the United States District Court Clerk a special

16   assessment fee of $200, which is due immediately.  Because of

17   his inability to pay, the Court waives the imposition of a

18   fine.  The Court further finds there is no identifiable victim

19   who incurred a financial loss as a result of this offense.

20           Now, I recognize, as Ms. Freeman aptly pointed out,

21   this is tantamount to a life sentence for you, Mr. Dean.  And

22   you probably will live another 20, and if you're lucky, 30

23   years.  Unfortunately for the victim here, she also has received

24   a life sentence, and her sentence is going to be another 60

25   years.  So it's unfortunate for both of you.  But when we talk

 1   about life sentences, there are two life sentences that have

 2   been in many ways given as a result of what happened here.

 3           I did consider the request for the variances, but even

 4   under the guideline as Ms. Freeman would love for me to apply, I

 5   think the sentence is still fair.

 6           I ask you at this time, are there any objections to the

 7   sentence imposed or to the manner in which the Court pronounced

 8   it other than those objections previously stated for the

 9   record?  For example, do you have any objection to the Court's

10   ultimate findings of fact or conclusions of law?  Furthermore,

11   you are instructed that if you have an objection, you must not

12   only state the objection, you must give the grounds for the

13   objection.

14           MS. FREEMAN:  Yes, Your Honor, several objections.

15   First, the Court's order that Mr. Dean not possess or use a

16   computer or any device that can access the Internet.  This

17   offense in no way involved the Internet or the use of a

18   computer.  There is no basis for that condition, and I would ask

19   that it be removed.

20           THE COURT:  Let's take that up first.  Why do we have

21   that in here?

22           PROBATION OFFICER:  Your Honor, the way we have

23   reviewed this case, Mr. Dean does have a problem with child

24   pornography.  And as the United States Probation Office knows

25   that child pornography is easily accessed through Internet

1   devices, this is a treatment and a precaution condition that

2   we would put on the defendant while he is under the supervision

3   of the probation office.  Because first and foremost, our number

4   one job is to protect the community, and that would be including

5   any children in child pornography videos and downloads.

6          THE COURT:  Okay.  I'll hear from the government.

7          MR. STUMP:  Your Honor, the United States concurs with

8   the recommendation of the probation office in this case, not

9   only for the treatment of this defendant, but also just for the

10   safety of the online community as well if and when he is

11   released.

12          THE COURT:  Anything else, Ms. Freeman?

13          MS. FREEMAN:  Yes, Your Honor.  This offense --

14          THE COURT:  No, I mean about this particular provision.

15          MS. FREEMAN:  No.

16          THE COURT:  The objection is overruled.  I think there

17   is sufficient evidence in the case that the defendant was

18   enticed by the fact that the victim here was under 18 years of

19   age.  And as a result, I think there is evidence that would

20   support, contrary to what the psychologist said, that the victim

21   would be interested in minor people -- minor children.  I

22   further find evidence here that he did use tapes and so forth,

23   and I think that probation is right.  It is purely a measure

24   to -- for treatment that such a provision is warranted.

25          MS. FREEMAN:  Your Honor, I object to the provision

 1   that he not have any contact with children under the age of 18.

 2   And I may need to request clarification.

 3           THE COURT:  That's under the age of 18 -- go ahead.

 4   Ask for your clarification.

 5           MS. FREEMAN:  Well, first, Your Honor, because this is

 6   a life sentence, effectively, and Mr. Dean has several

 7   grandchildren, I would not want the Bureau of Prisons to rely on

 8   this provision to prohibit his grandchildren from visiting him

 9   in an appropriate Bureau of Prisons facility.  The Bureau of

10   Prisons has no unsupervised visitation.  There would be no

11   dangerous -- danger to the children or to any child in the

12   region at all, and we therefore ask that that be lifted.  That

13   is simply not necessary and should not be there for the

14   restriction of his supervision while in the Bureau of Prisons.

15           THE COURT:  I'll hear from probation.

16           PROBATION OFFICER:  While probation is under the

17   understanding there would be no unsupervised visits within the

18   Federal Bureau of Prisons, again, I am looking at the victim in

19   particular, society as a victim, and any child who may have

20   occasion to be harmed by this particular defendant.

21           THE COURT:  Now, this is a provision that only applies

22   after he comes out on supervised release.

23           MS. FREEMAN:  That was my request for clarification.  I

24   don't --

25           THE COURT:  No.  This provision only applies as a

1   condition of supervised release.  I would further clarify that

2   the provision does not apply while he's in prison.

3           MS. FREEMAN:  And that's what I request, Your Honor.

4           THE COURT:  Yes.

5           MS. FREEMAN:  I think that should we ever see Mr. Dean

6   on supervised release, we would request some modifications of

7   that.

8           THE COURT:  The judgment should expressly reflect that

9   this provision should not apply while he is in prison.  In

10  fact, I don't think any of these provisions apply while he's in

11  prison.  I think the prison can do whatever it wants to do.

12          MS. FREEMAN:  Well, I think they rely on the Court's

13  recommendations to determine what they'll do, Your Honor.

14          THE COURT:  But I think he should see his

15  grandchildren.  I think that would be good for him and for them.

16          MS. FREEMAN:  Your Honor, I object to the consecutive

17  sentences.  I understand the Court's basis for imposing

18  consecutive sentences, but I would point out that count two is,

19  in effect, a lesser included offense of count one, and

20  therefore, for that reason as well, a consecutive sentence is

21  inappropriate.

22          THE COURT:  Why didn't you bring this up before?

23          MS. FREEMAN:  I think I did.

24          THE COURT:  I don't remember any lesser included

25  offense argument being presented to the Court.

1          MS. FREEMAN:  I think I said those magic words earlier

2     today, Your Honor.

3          THE COURT:  I'm confident that I -- if it did, I sure

4     didn't hear it.

5          Does the government remember a lesser included offense

6     argument?

7          MR. STUMP:  No, sir.

8          THE COURT:  Because I did not research that issue.  I

9     have not looked at it.  And, you know, it's one of those things

10    I would have researched.

11         MS. FREEMAN:  Well, it's possession of child

12    pornography.  It's possession of pornography that he created and

13    produced.  His production of that pornography is the basis for

14    count one.  It seems to me it's pretty clear that count two is a

15    lesser included offense of count one.

16         THE COURT:  And what is count two?

17         MS. FREEMAN:  Count two is the possession of child

18    pornography with a statutory maximum of ten years.

19         THE COURT:  And count one is what, now, the

20    production?

21         MS. FREEMAN:  Production of child pornography with a

22    statutory maximum of 20 years.

23         MR. STUMP:  Your Honor, count one addresses the conduct

24    of reproducing certain already recorded images and depictions

25    onto DVDs.  That's count one.  Count two encompasses not only

1    those DVDs, but all of the other child pornography images that

2    this defendant possessed of the victim in this case.  We don't

3    believe that this second count is a lesser included charge.  I

4    think that's something that if the defense felt that way, they

5    could have raised it a long time ago and we could have briefed

6    and addressed.

7          THE COURT:  I'm going to say this.  If the defendant

8    wants to raise this issue, why don't you raise it by a motion

9    for new trial, and I'll set it for briefing.

10         MS. FREEMAN:  Yes, Your Honor.

11         THE COURT:  And you need to look at the record to see

12   also whether it's timely.

13         MS. FREEMAN:  Your Honor, I would simply point out that

14   the facts as described by Mr. Stump are that all of these images

15   are of the victim, and they were produced by Mr. Dean.

16         THE COURT:  Again, if you wish to raise this issue,

17   I'll consider it on a motion for new trial.

18         MS. FREEMAN:  Yes, sir.

19         THE COURT:  Make sure it's filed immediately so we can

20   set it for briefing.

21         MS. FREEMAN:  Yes, sir.

22         THE COURT:  Anything else?

23         MS. FREEMAN:  Only the objections that I raised earlier

24   regarding the calculation of the sentencing guidelines.

25         THE COURT:  And those are all preserved.  Anything

1   else?

2           MS. FREEMAN:  And, Your Honor, we object that this

3   sentence is not reasonable under the factors of 3553(a).

4           THE COURT:  All right.  Anything else from Mr. Dean?

5           MS. FREEMAN:  No.

6           THE DEFENDANT:  No, sir.

7           THE COURT:  Okay.  Then, Mr. Dean, do you have

8   anything to say as to why the sentence as announced should not

9   be imposed or do you have anything to say in mitigation of the

10  sentence?

11          THE DEFENDANT:  I want to say I'm sorry to everybody in

12  this courtroom today.  That's all I've got to say.

13          THE COURT:  Mr. Dean, it is the order, judgment and

14  decree of the Court that the sentence as announced is hereby

15  imposed.  Now you have ten days to file any notice of appeal.

16  If you cannot afford the cost of an appeal, the Court will allow

17  you to appeal at no cost, including furnishing you with a free

18  transcript and a free attorney.

19          As to that last objection about concurrent sentences,

20  that objection is overruled, subject to if the defendant wants

21  to file any motion for reconsideration.

22          You are in the custody of the marshal.

23      (Proceedings concluded at 3:25 p.m.)

24              * * * * * * * * * * * * * *

25

1                COURT REPORTER'S CERTIFICATE

2        I certify that the foregoing is a correct transcript

3 from the record of the proceedings in the above-entitled matter.

4        This 31st day of December, 2008.

5                      /s/ Patricia G. Starkie
                       Registered Diplomate Reporter

6                       Certified Realtime Reporter
                       Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25